## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JUANITA KENNEDY,

               Plaintiff,

     v.

THOMAS J. VILSACK,

            Defendant.

Case No. 16-cv-2176 (JMC)

## MEMORANDUM OPINION AND ORDER

Plaintiff Juanita Kennedy sues her employer, the U.S. Department of Agriculture (USDA), claiming that the agency violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by demoting her, denying her training opportunities, and subjecting her to a hostile work environment because of her race. ECF 1. The agency moves for summary judgment, arguing that it had legitimate reasons for each of its employment actions. ECF 34. For the most part, the Court agrees. However, there are genuine disputes of fact material to Kennedy's retaliation claim—specifically, whether Kennedy's supervisor denied her a significant training opportunity in retaliation for filing an Equal Employment Opportunity (EEO) complaint. As such, the Court will **GRANT IN PART** and **DENY IN PART** the USDA's motion for summary judgment.[1]

## I.    BACKGROUND

The following facts are undisputed except where noted. Juanita Kennedy is an African American woman. *See* ECF 36 at 7 ¶ 3; ECF 34-1 at 5. From 2007 to 2013, she worked for the

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

USDA's Animal and Plant Health Inspection Service (APHIS) in Riverdale, Maryland as an Administrative Support Assistant, GS-7.[2] ECF 34 at 14; ECF 36 at 7 ¶ 1; ECF 37 ¶ 1. In June 2013, Kennedy was promoted to Supervisory Resource Management Specialist (SRMS), a GS-9 position with the potential for promotion to GS-11. ECF 37 ¶ 2. Her first-line supervisor was Associate Executive Director Matthew Rhoads, a white man. ECF 34 at 14; ECF 34-1 at 2; ECF 36 at 7 ¶ 2. The role was subject to a twelve-month probationary period from June 2013 to June 2014, and Kennedy could be reassigned to a nonsupervisory position if she did not perform well during that period. ECF 37 ¶ 15; ECF 34-2 at 1. After Kennedy accepted the job, she participated in a weeklong mandatory training for new supervisors called the Fundamentals of APHIS Human Resources Management (FAHRM). ECF 34 at 17; ECF 36 at 8 ¶ 12; ECF 36-58 at 13. Kennedy claims that Terry Morris, an African American supervisor, told her not to accept the supervisory position because she was "being set up to fail," and that someone Kennedy would be working with "had people in high places." ECF 36-63 at 5–6.

### A. Supervision of Wiley

In her new role, Kennedy supervised five employees including Lynekia Wiley. ECF 36 at 8 ¶ 13; ECF 36-58 at 9. Wiley, who is an African American woman, had previously been supervised by Stacie Cain, a white woman. ECF 36 at 9 ¶ 15; ECF 36-63 at 4.

Per Kennedy, Wiley was—to put it mildly—a difficult employee to manage. She sent Kennedy a series of strongly worded emails, was disciplined for overstating her work hours on timesheets, received unauthorized mail at her work address, failed to attend mandatory work meetings, and took time off work without permission. *See* ECF 36-1; ECF 36-7; ECF 36-9;

---

[2] "The General Schedule (GS) classification and pay system covers the majority of civilian white-collar Federal employees" and "has 15 grades—GS-1 (lowest) to GS-15 (highest)." U.S. Off. of Pers. Mgmt., *General Schedule*, https://perma.cc/9Y7J-AMPS.

ECF 36-10; ECF 36-12; ECF 36-13; ECF 36-15; ECF 36-16; ECF 36-17; ECF 36-18; ECF 36-19; ECF 36-24; ECF 36-25; ECF 36-26; ECF 36-27; ECF 36-29; ECF 36-31. At one point, Kennedy scheduled a meeting at Wiley's request to explain how to complete her timesheet. ECF 36 at 10 ¶ 31; ECF 36-72 at 1. Wiley emailed Rhoads stating that she was unable to attend the meeting because she was "overwhelmed by the concept of being forced to be in the same space as [Kennedy]," and felt "ill" at the thought of attending. ECF 36 at 10 ¶ 32; ECF 36-12. A few weeks later, Wiley emailed Rhoads stating that Kennedy had sent her "threatening notes" and made her "physically ill." ECF 36 at 11 ¶¶ 39–40; ECF 36-15. In another email exchange, Wiley accused Kennedy of "verbally and mentally abus[ing]" her, and "jabbing [her], berating [her] and pushing [her] into a corner with [her] negative words and aggressive behavior." ECF 36 at 14 ¶ 66; ECF 36-27 at 2. In September 2013, Wiley filed an informal EEO complaint against both Kennedy and Rhoads alleging disability discrimination and hostile work environment claims, among other things. ECF 36 at 11 ¶ 36; ECF 36-52.

**B. Kennedy's Demotion**

In June 2013, Rhoads met with Kennedy about her transition to the supervisory role and gave her a list of action items to complete. ECF 37 ¶ 3; *see* ECF 34-2 at 21, 27, 29. On October 10, 2013, Rhoads emailed Kennedy a list of important tasks that remained incomplete. ECF 37 ¶ 4; *see* ECF 34-2 at 37–39. Rhoads contacted Ernie McFadden in Employee Relations in January 2014 because he was concerned about Kennedy's performance as a supervisor, and the two began working to reassign Kennedy to a different position. *See* ECF 34-1 at 7; ECF 34-2 at 25; ECF 37 ¶ 7.

On March 12, 2014, Rhoads met with Kennedy and told her she would be reassigned to a different position. ECF 37 ¶ 8. Kennedy filed an informal EEO complaint on March 18. *Id.* ¶ 5.

She was temporarily detailed to a position at USDA's Washington, D.C. office from March 24 to April 20, and then reassigned to serve as a Management Analyst—a nonsupervisory, GS-9 position. *Id.* ¶ 6. Rhoads issued Kennedy a formal notice explaining the reasons for her reassignment, including that "assigned tasks remain incomplete or were completed in a fashion that does not demonstrate acceptable competence in areas . . . fundamental to successful supervision." ECF 36-34 at 2. Kennedy claims that, during a meeting with Rhoads on April 21, Rhoads "was upset that she had filed her EEO complaint" and told Kennedy "in a loud tone, 'You know, you can use any remedy you like, it doesn't matter to me.'" ECF 36 at 18. On May 29, Kennedy filed a formal EEO complaint. ECF 37 ¶ 5.

Kennedy's new first-line supervisor was Ingrid Watson. ECF 36 at 17 ¶ 88. In April 2014, Kennedy submitted a request to attend the Blacks in Government (BIG) Conference. ECF 34 at 18; ECF 36 at 17 ¶¶ 91–92. Watson met with Kennedy and denied that request, but identified other training opportunities Kennedy could pursue. *See* ECF 34 at 18; ECF 36 at 19 ¶ 108; ECF 37 ¶ 11. The parties dispute what Watson said during the meeting. Kennedy claims that, "when the topic of the BIG conference came up, Ms. Watson said, 'What did you not do that Matt asked you to do?' referring to not filing an EEO complaint." ECF 36 at 19 ¶ 110. Watson denies making that statement, *see* ECF 34 at 14 n.1, and maintains that she first became aware of Kennedy's EEO complaint in October 2014, ECF 37 ¶ 10. Kennedy also claims that Watson sent her an email in July 2014, asking Kennedy "to give her information regarding local job fairs that [Kennedy] wanted to attend." ECF 36 at 19. Kennedy believed this email implied that she should start looking for another job. *Id.* at 19–20. In November 2014, Kennedy asked to attend the 2014 Federal Interagency Diversity Partnership (FIDP) Training Day. *See* ECF 36 at 20 ¶ 115. Watson

denied that request because she preferred that Kennedy attend an internal meeting that day. *Id.* ¶ 116.

### C. Procedural History

Kennedy filed this suit, bringing three claims under Title VII: race discrimination, retaliation, and hostile work environment. ECF 1. USDA filed an answer. ECF 7. After the conclusion of discovery, USDA filed a motion for summary judgment, ECF 34, which Kennedy opposes, ECF 36.

## II.    LEGAL STANDARD

### A.  Rule 56

The Court will grant a motion for summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences" in that party's favor. *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

A party that moves for summary judgment must support its factual positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets that burden, it falls to the nonmoving party to establish that a genuine dispute exists regarding a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). To do so, the nonmoving party must demonstrate that "there is

sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict for that party." *Talavera*, 638 F.3d at 308 (quoting *Anderson*, 477 U.S. at 249). The nonmoving party must produce more than a "scintilla of evidence" in support of its positions, *Anderson*, 477 U.S. at 252, and its evidence must consist of more than unsupported allegations or denials. *See Celotex*, 477 U.S. at 322 n.3. If the evidence the nonmoving party cites is "merely colorable" or "not significantly probative," summary judgment may be granted in favor of the moving party. *Anderson*, 477 U.S. at 249–50.

In making their arguments for or against summary judgment, both parties are responsible for pointing the Court to specific evidence in the record that supports their positions. Fed. R. Civ. P. 56(c)(1)(A); *see also Potter v. District of Columbia*, 558 F.3d 542, 550 (D.C. Cir. 2009). "[E]vidence laying dormant in the record is not enough." *Potter*, 558 F.3d at 550. "[T]he district court is not 'obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make its own analysis . . . of what may, or may not, be a genuine issue of material disputed fact.'" *Id.* (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988)).

### B. Title VII

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1), and from retaliating against an employee for "oppos[ing] any practice" made unlawful by Title VII, § 2000e-3(a). Courts generally evaluate Title VII discrimination and retaliation claims using the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To make out a prima facie discrimination claim, the plaintiff must show that "(1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the unfavorable action gives

rise to an inference of discrimination (that is, an inference that his employer took the action because of his membership in the protected class)." *Forkkio v. Powell*, 306 F.3d 1127, 1130 (D.C. Cir. 2002). And to establish a Tile VII retaliation claim, a plaintiff must demonstrate that "(1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two." *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003). The burden then shifts to the employer to present a legitimate, nondiscriminatory (or nonretaliatory) justification for the challenged action. *McDonnell Douglas Corp.*, 411 U.S. at 802.

However, if the employer articulates a legitimate, nondiscriminatory reason for the challenged action, the *McDonnell Douglas* framework falls away. *Figueroa v. Pompeo*, 923 F.3d 1078, 1086–87 (D.C. Cir. 2019). Instead, the court simply asks: "[h]as the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason[,] and that the employer intentionally discriminated [or retaliated] against the employee?" *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *see also Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (applying *Brady* to retaliation claims).

To show that the employer's stated reasons were pretextual, a plaintiff may cite "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or [its] pattern of poor treatment of other employees in the same protected group . . . or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015). In the context of retaliation, "[t]he temporal proximity between an employee's protected activity and her employer's adverse action is a common and often probative form of evidence of retaliation," *id.*, although temporal proximity without more is

insufficient to survive summary judgment, *see Minter v. District of Columbia*, 809 F.3d 66, 71–72 (D.C. Cir. 2015).

Title VII also prohibits employers from "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To prevail on a hostile work environment claim, a plaintiff must show that "she was subjected to discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014) (quoting *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (per curiam)). That requirement includes both a subjective and objective element. *See Harris*, 510 U.S. at 21–22. In other words, even if an employee subjectively views her environment as abusive, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Id.* at 21. Neither the "ordinary tribulations of the workplace" nor "petty insults, vindictive behavior, and angry recriminations" are sufficient. *Brooks*, 748 F.3d at 1277–78 (first quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); then quoting *Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 74 (1st Cir. 2011)). This analysis requires the Court to look "at all the circumstances, including the frequency of the [alleged] discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Vickers v. Powell*, 493 F.3d 186, 197 (D.C. Cir. 2007) (quoting *Faragher*, 524 U.S. at 787–88).

III.    ANALYSIS

Kennedy argues that the agency violated Title VII by demoting her to a nonsupervisory position because of her race and/or protected activity; denying her training opportunities in retaliation for her protected activity; and subjecting her to a hostile work environment. *See* ECF 36. The Court assesses each claim in turn.[3]

A. Demotion

Kennedy argues that she was demoted to a nonsupervisory position because of her race and in retaliation for filing an EEO complaint. *See* ECF 36 at 27–29. The agency contends that Kennedy was demoted not for any discriminatory or retaliatory reason, but because she "failed to meet management's expectations for the supervisory position." ECF 34 at 15. The agency points to a well-documented pattern of chronic performance issues. To name just a few, according to Rhoads: Kennedy "did not organize her work well, and sometimes would forget assignments from one meeting to the next, even if they were provided in writing," ECF 34-1 at 7; demonstrated poor attention to detail by repeatedly failing to follow instructions when scheduling meetings, *see* ECF 34-2 at 31; "[d]id not appear to know, after three different discussions, which five people she would be supervising," *id.*; and failed to timely complete a number of tasks assigned to her even after multiple requests, *id.* at 31–35. By February 2014, many of the tasks Rhoads had assigned Kennedy in June 2013 were still incomplete. *Id.* at 35. "[D]issatisfaction with an employee's performance and identifying specific examples of the employee's inadequate performance is a

---

[3] Kennedy's opposition brief begins with a "Statement of Material Facts in Dispute," ECF 36 at 7–21, but Kennedy references only some of those disputed facts in her argument, *id.* at 21–35. The Court views the evidence in the light most favorable to Kennedy as the nonmoving party, *see Talavera*, 638 F.3d at 308, but must rely on Kennedy's legal arguments to understand which disputed facts she believes are material to each of her claims. It would be improper (indeed, impossible) for the Court to speculate about which allegedly disputed facts are relevant to which legal claims where Kennedy has failed to draw out those connections herself. *See Stephenson v. Cox*, 223 F. Supp. 2d 119, 122 (D.D.C. 2002) ("The court's role is not to act as an advocate for the plaintiff and construct legal arguments on h[er] behalf."); *Potter*, 558 F.3d at 553 (Williams, J., concurring) ("[J]udges 'are not like pigs, hunting for truffles buried in briefs' or the record." (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))).

legitimate, non-discriminatory reason for an adverse action." *Hogan v. Hayden*, 406 F. Supp. 3d 32, 44 (D.D.C. 2019) (citing *Paquin v. Fed. Nat'l Mortg. Ass'n*, 119 F.3d 23, 29 (D.C. Cir. 1997)). The burden therefore shifts to Kennedy to show that the agency's asserted reasons for her demotion were pretextual. *See Brady*, 520 F.3d at 494. The Court turns first to Kennedy's race discrimination arguments, and then to retaliation.

### 1. *Race discrimination*

Kennedy's central theory of race discrimination is that the agency promoted her because it needed an African American supervisor to stand as a "buffer" between the agency and Wiley's race discrimination complaints—and that once Kennedy served that purpose, she was demoted. *See* ECF 36 at 27–28. Per Kennedy, the agency was concerned that "a problematic employee (Ms. Wiley) . . . was filing race discrimination claims against it." *Id.* at 27. Rhoads promoted Kennedy, an African American woman, to serve as Wiley's supervisor so that any future complaints Wiley filed would "los[e] credibility because now her supervisor was of her same race." *Id.* at 27–28. Ultimately, Wiley did file an EEO complaint against Kennedy—and "[o]nce Ms. Wiley's EEO issues were addressed, Mr. Rhoads quietly detailed Ms. Kennedy downtown until he was able to fully demote her. Ms. Kennedy was put into that position solely because of her race and thus, demoted from the position because of her race." *Id.* at 28.

Kennedy has not identified any competent record evidence to support this theory—in fact, the record undermines it. Kennedy's sole supporting citation is to page 3 of her opposition brief, *see id.* at 27, which states that Rhoads encouraged Kennedy to apply for the SRMS position, knew she had no supervisory experience beforehand but nonetheless believed she was qualified for the position, told the selection panel that the selectee "has to be comfortable working with challenging

people," and that Kennedy attended a weeklong fundamentals training for new supervisors.[4] ECF 36 at 8 ¶¶ 5, 9–12; *see* ECF 36-53; ECF 36-58 at 8–10, 12. It is not clear how any of this information supports Kennedy's "buffer" theory. Read generously, Kennedy may have intended to refer instead to page 4 of her opposition brief, *see* ECF 36 at 9 ¶ 18, which cites to the following statement from Kennedy's own affidavit: "management was putting Ms. Wiley (African-American) under Plaintiff's supervision so that if Ms. Wiley filed another complaint and now named Plaintiff (another African-American), it would not carry as much weight as the complaint against Ms. Cain (Caucasian) carried," ECF 36-72 at 1. But this is a conclusory statement, and the affidavit does not explain what facts or experiences led Kennedy to that belief. *See id.* "A non-movant's own assertions about facts within her or his personal knowledge can be competent evidence to create a material factual dispute . . . but party assertions 'so conclusory' as to put a jury in 'no position to assess' whether they are based in fact will not suffice." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017) (quoting *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999)). Even construing the evidence in the light most favorable to Kennedy, this single conclusory statement cannot support her "buffer" theory of discrimination.

Further, Kennedy's "buffer" theory is premised on the idea that Rhoads knew Wiley was filing race discrimination claims against the agency. But that allegation is also not supported by the record. The agency has provided a declaration stating that "there was no EEO complaint activity either formal or informal against Stacie Cain filed by Ms. Wiley, either prior to, during, or after [Kennedy] being hired into the Supervisory Resource Management Specialist Role."

---

[4] Kennedy claims that this weeklong training was the sole training she received, ECF 36 at 8 ¶ 12, but that is not supported by the record citations she purports to rely on. *See* ECF 36-58 at 12–13 (explaining that, in addition to the required weeklong training, Rhoads arranged for Kennedy to spend a week with the team's resource management expert in Minneapolis, receiving mentorship and "interact[ing] with all our subject matter experts," and that Kennedy participated in online trainings related to "time and attendance, travel requirements, and other administrative functions that she had responsibility for").

ECF 44-2 at 2. Rhoads testified that he had "no knowledge" of any grievances or complaints (EEO or otherwise) that Wiley filed before Kennedy was hired into her new role. ECF 44-3 at 3–4. According to Rhoads, it was only after Kennedy was hired into the supervisory role that Rhoads learned some of Wiley's prior managers had "expressed frustrations at [Wiley's] lack of availability, her inability to complete assignments on time . . . often stemming from being late, [and] not being in the office when she was supposed to be." ECF 44-3 at 5–7. Kennedy offers nothing to counter the agency's evidence. She insists that Wiley filed an EEOC complaint against Cain, ECF 36 at 9 ¶ 15, but the only testimony she cites to support her claim (from her deposition) includes no discussion of any such complaint, *see* ECF 36-63 at 4. Rather, Kennedy testified that when Cain "had problems with [Wiley], [Wiley] was removed from [Cain's] staff and placed elsewhere." ECF 36-63 at 4. That statement does not allow the Court to draw any inference that Wiley filed a *discrimination* complaint (or any complaint) against Cain, or that Rhoads knew about such a complaint and made Kennedy Wiley's supervisor for that reason.[5] Kennedy's unsupported contention that she was hired into the supervisory role to serve as a "buffer" against Wiley's race discrimination complaints does not create a genuine dispute that Wiley in fact filed any such complaints before Kennedy was hired or that Rhoads believed Wiley had done so.

Next, Kennedy argues that her demotion was discriminatory because "similarly situated co-workers" were not demoted within months of promotion. *See* ECF 36 at 26. But Kennedy says nothing whatsoever about who those similarly situated co-workers were, nor can the Court discern from her statement of disputed facts who she might be referring to. *See id.* Kennedy's sole citation

---

[5] Kennedy also states that the agency "was aware that [Wiley] was a 'problem' employee." ECF 36 at 9 ¶ 21. However, her only evidence for that claim is a single email from Wiley's former supervisor (Eric Longen) to Wiley, asking Wiley where she was. *See id.*; ECF 36-1. Even if this email could establish that Rhoads was aware of Wiley's performance issues, it does not suggest that Rhoads was aware that Wiley was filing race discrimination complaints against the agency or that Kennedy was promoted solely to be a "buffer."

to the record is a statement Rhoads made during his deposition that he "had never been in a scenario where [he] had looked at reassigning . . . a probationary employee before." *Id.* (quoting ECF 36-58 at 3). But absent any information about other employees Rhoads may have supervised who were not demoted during a probationary period—including whether they were members of a different protected class than Kennedy and whether they had similar performance issues—the Court cannot discern whether these unnamed employees were similarly situated to Kennedy and, therefore, how their treatment bears on Kennedy's claim. *See Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1174 (D.C. Cir. 2021) (explaining that employees are similarly situated only if they "were charged with offenses of comparable seriousness" and "all of the relevant aspects of [their] employment situation[s] were nearly identical").

Kennedy also points to her testimony that Terry Morris, an African American supervisor, told Kennedy not to accept the supervisory position because she was "being set up to fail." ECF 36 at 26; *see* ECF 36-63 at 5. That testimony was followed by this exchange:

> Q: Did [Morris] give you a reason why she said that?
>
> A: Well, I would guess that she overhead or was in a meeting where they discussed what they planned to do.
>
> Q: Did she tell you that she was in a meeting?
>
> A: No, she didn't. But if she told me that – to not accept the position or – because I was being set up to fail, then, apparently, she knew what – why I was being given this job.
>
> . . .
>
> Q: And did you ask her what she meant by – by her statement that you were being set up to fail?
>
> A: She said something to the fact that someone that I was going to be working with had people in high places. . . . I didn't know what she was referring to when she said that.

ECF 36-63 at 5–6.

The agency argues that these statements are inadmissible hearsay. *See* ECF 44 at 1. "Sheer hearsay . . . counts for nothing" on summary judgment, and Kennedy makes no effort to explain why these statements are non-hearsay or how they could be presented in any admissible form at trial. *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (quoting *Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000)); *see* Fed. R. Civ. P. 56(c)(2); *see generally* ECF 36. But even assuming these statements are admissible, they are not enough for Kennedy to survive summary judgment. Morris's statements are, at best, ambiguous. Even Kennedy concedes that she did not know what Morris meant by her statement that Kennedy's future colleagues "had people in high places," and could only speculate about what led Morris to make these cryptic statements. ECF 36-63 at 6. Kennedy admits that she had to "guess" as to the source of Morris's belief that she was being set up to fail. *Id.* at 5. Where the plaintiff's best evidence are ambiguous statements and guesswork, the D.C. Circuit has held that "[t]he possibility that a jury might speculate in the plaintiff's favor . . . is simply insufficient to defeat summary judgment." *Montgomery v. Chao*, 546 F.3d 703, 708 (D.C. Cir. 2008); *see Iyoha v. Architect of the Capitol*, 927 F.3d 561, 574 (D.C. Cir. 2019) (holding that employee could not "show retaliatory animus based on ambiguous statements . . . with nothing on their face to connect them to [the employee's] previous complaints or an intent to retaliate"). Nor do Morris's statements suggest any connection between Kennedy's promotion and her race. To survive summary judgment, "[t]he evidence of record must be such that a reasonable jury could not only disbelieve the employer's reasons, but conclude that the real reason the employer took a challenged action was a prohibited one." *Walker v. Johnson*, 798 F.3d 1085, 1093 (D.C. Cir. 2015). And Kennedy does not explain how Morris's statements suggest that she was "set up to fail" because of her race or any other protected trait.

Finally, Kennedy does not do enough to contest the agency's evidence concerning the quality of her performance as a supervisor. In her discussion of retaliation, Kennedy remarks, almost in passing, that "[s]he was given a document purportedly detailing every . . . way [she was] defici[ent]t as a supervisor. . . . However, not only were the items untrue, conversely, Mr. Rhoads approved a within-grade increase only the day after she received the demotion notice." ECF 36 at 31. Although Kennedy raises this issue in the context of her retaliation claim, the Court will briefly address it as to Kennedy's discrimination claim as well.

Rhoads issued Kennedy a formal reassignment notice on April 16, 2024, explaining in detail the reasons for her reassignment to a nonsupervisory position. ECF 36-34. The notice includes nearly two pages of specific tasks that "remain[ed] incomplete or were completed in a fashion that d[id] not demonstrate acceptable competence in areas . . . fundamental to successful supervision." *Id.* at 2–3. Kennedy dismisses those items as "untrue," but points to no record evidence to support her contention. ECF 36 at 31. That is insufficient. And although Kennedy identifies a few examples of good performance in her statement of disputed material facts, she fails to explain why they are material or how they counter the performance deficiencies the agency identified. First, "[o]n June 25, 2013, Mr. Rhoads sent Plaintiff a list of assignments for Plaintiff to complete. . . . That same day, Plaintiff responded with progress and anticipated completion dates for those assignments." ECF 36 ¶¶ 22-23; *see* ECF 36-5; ECF 36-6. Second, Kennedy organized two trainings for her staff in August 2013. *See* ECF 36 ¶ 26; ECF 36-11. Third, Kennedy attempted to manage Wiley, including by trying to set up a meeting to train Wiley on the timesheet software. *See* ECF 36 ¶ 31; ECF 36-72 at 1. But a few sporadic examples of good performance do not negate the record evidence regarding the extensive pattern of poor performance that the agency claims led Rhoads to demote Kennedy. Rhoads himself recognized that Kennedy had some

successes as a supervisor—for example, on June 26, 2013, Rhoads wrote in his performance notes that Kennedy led "[a] very good first meeting with the team" and "did a great job setting a positive, team-oriented tone." ECF 34-2 at 31. But those bright spots were ultimately outweighed by chronic performance issues, which Rhoads memorialized in his performance notes, described in his affidavit, and cited at length in his official notice demoting Kennedy. *See* ECF 34-1 at 3–4 (Rhoads affidavit, describing performance issues); ECF 34-2 at 31–43 (Rhoads performance notes); ECF 36-34 (reassignment notice). If Kennedy disagrees with Rhoads' characterization of her conduct, she must cite specific evidence to counter the performance issues identified in the record. But she has not done that. With the majority of those instances of poor performance left undisputed, the Court cannot conclude that Rhoads' reasons for demoting Kennedy were "untrue."[6] ECF 36 at 31.

Nor does Kennedy explain how her within-grade pay increase negates the performance deficiencies Rhoads identified. Rhoads contends that he re-assigned Kennedy to a nonsupervisory position because she did not "demonstrate acceptable competence in areas . . . fundamental to successful supervision." ECF 36-34 at 2. However, he assigned her to a different, nonsupervisory position at the same grade (GS-9) and pay. *Id.* at 3. Kennedy's subsequent within-grade pay increase reflected that she demonstrated "an acceptable level of competence" for a GS-9 employee

---

[6] Kennedy also identifies several supposed examples of good performance in her statement of disputed material facts that are not adequately supported by the record. Kennedy claims that "[t]hroughout the Fall of 2013, [she] routinely communicated to Mr. Rhoads her progress on specific tasks." ECF 36 ¶ 50. But the exhibit Kennedy cites, Exhibit 20, is just one example of Rhoads providing Kennedy a list of action items and Kennedy asking Rhoads a question about one of those tasks. *See* ECF 36-20 (October 10 email exchange). This lone email does not support the proposition that Kennedy "routinely communicated" with Rhoads about her progress "throughout the fall of 2013" or that she satisfactorily completed the tasks Rhoads identified as outstanding. Kennedy relies on this same email exchange in her response to the agency's statement of material facts: she alleges that she responded to Rhoads' October 10 email (which contained a long list of action items) with "a detailed account of her progress." ECF 37 ¶ 4. Again, the email exchange itself does not support that claim. Kennedy responded to Rhoads' email with a question about a single action item, not a detailed account of her progress. *See* ECF 36-20. Kennedy further contends that one of the tasks Rhoads accused her of failing to complete "was actually completed by another employee, Mary Beverly, and should not have been counted against Plaintiff." ECF 36 ¶ 101. But the exhibit Kennedy cites to support that proposition, Exhibit 35, says nothing about Mary Beverly or who completed the assignment in question. *See* ECF 36-35.

in her then-current nonsupervisory role—not necessarily an acceptable level of competence for a supervisor. *See* ECF 36-36. Absent any argument from Kennedy as to how a subsequent within-grade pay increase bears on her performance as a supervisor, the pay increase alone does not undermine Rhoads' reasons for reassignment. Similarly, Kennedy points out that she received a cash award for her performance in June 2014—but that was *after* she was demoted to a nonsupervisory role. *See* ECF 36 at 19; ECF 37 ¶ 6 (establishing that Kennedy was demoted in April 2014). Again, Kennedy does not explain how a performance award received during her time in a nonsupervisory role speaks to her performance as a supervisor. Overall, Kennedy has not satisfied her obligation to dispute the agency's evidence about her performance with competent, record evidence. As a result, she cannot withstand summary judgment.

### 2. Retaliation

The parties agree on the following timeline: Kennedy filed an informal EEO complaint on March 18, 2014; was assigned to a temporary detail on March 24, 2014; was reassigned to a nonsupervisory Management Analyst position on April 20, 2014; and filed a formal EEO complaint on May 29, 2014.[7] *See* ECF 37 ¶¶ 5-6. Kennedy argues that she was detailed and then demoted to a nonsupervisory position in retaliation for her March 18 EEO complaint. ECF 36 at 28. As discussed above, the agency has offered a legitimate, nonretaliatory reason for Kennedy's demotion: her poor performance as a supervisor. ECF 34 at 15; *see supra* Part III.A. The burden shifts to Kennedy to show that the agency's asserted reason for her demotion was pretext for retaliation. *See Brady*, 520 F.3d at 494.

---

[7] Kennedy states that, "[p]rior to the filing of her EEO complaint, [she] complained numerous times about the hostile conduct of Ms. Wiley." ECF 36 at 30. But such complaints are not protected by Title VII unless Kennedy was reporting *discriminatory* hostile conduct by Wiley—which Kennedy never alleges. *See Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (explaining that, to trigger Title VII protection, an employee's complaint of mistreatment "must in some way allege unlawful discrimination"). There is therefore no genuine dispute that Kennedy first engaged in protected activity on March 18, 2014.

Kennedy seems to rely on the temporal proximity between her protected activity and her detail and demotion. *See* ECF 36 at 30–31. But temporal proximity without more is insufficient to survive summary judgment. *See Minter*, 809 F.3d at 71–72. And regardless, any proximity here does not support a causal link between Kennedy's protected activity and the agency's adverse action. Kennedy does not dispute that Rhoads decided to reassign her *before* she filed her March 2014 EEO complaint. *See* ECF 37 ¶¶ 7–8. In January 2014, Rhoads contacted Ernie McFadden "to discuss [his] concerns that [Kennedy] was not performing satisfactorily at the supervisory level." ECF 34-1 at 7. Rhoads began working with McFadden "to complete the proper procedures" to reassign Kennedy, *id.*, and sent McFadden an email on February 3, 2014 with documentation supporting the reassignment decision, ECF 34-2 at 25. The parties agree that Rhoads met with Kennedy on March 12, 2014, and told her that she was being reassigned. *See* ECF 37 ¶ 8. So, although Kennedy was officially placed on detail on March 24 and was reassigned to a nonsupervisory position on April 20, *id.* ¶ 6, there is no genuine dispute that Rhoads had decided to demote her to a nonsupervisory position several months earlier, *see id.* ¶ 7. "Employers need not suspend previously planned [adverse actions] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001). Thus, any temporal proximity between protected activity and adverse action here does not support Kennedy's argument for pretext, because Rhoads decided to detail and reassign Kennedy before she filed her EEO complaint.

As discussed above, Kennedy also argues in passing that the reasons Rhoads provided for her reassignment were "untrue," ECF 36 at 31, but that claim is unsupported for the reasons previously discussed. *See supra* Part III.A.1.

\*    \*    \*

Kennedy has identified no record evidence to suggest that the agency's stated reason for demoting her—her poor performance as a supervisor—was pretextual. The agency is entitled to summary judgment on this issue.

## B. Training Opportunities

After Kennedy was demoted to a nonsupervisory role, Ingrid Watson became her new supervisor. ECF 36 at 17 ¶ 88. Kennedy claims that Watson retaliated against her for filing an EEO complaint by denying her the opportunity to attend the Blacks in Government (BIG) Conference and the 2014 Federal Interagency Diversity Partnership (FIDP) Training Day. *See id.* at 31–32. The Court finds that genuine disputes of material fact preclude summary judgment as to Kennedy's BIG Conference retaliation claim, but that there is no genuine dispute that Watson denied Kennedy's request to attend the FIDP Training Day for a legitimate, nonretaliatory reason.

### 1. *BIG Conference*

The following facts are undisputed. Kennedy submitted a request to attend the BIG Conference in April 2014. ECF 34 at 18; ECF 36 at 17 ¶¶ 91–92. On April 28, 2014, Kennedy emailed her justification for attending the conference to Watson, *see* ECF 34 at 18; ECF 36 at 19 ¶ 106, stating: "I am attending so that I can take CEU courses that are worth college credits. The courses that I plan to take will involve Diversity Management, EEO in the Federal Sector and Management and Leadership Best Practices." ECF 36-40 at 2. The deadline for supervisors to submit employee names for consideration to attend the conference was April 30, 2014, and Watson did not submit Kennedy's name for consideration. *See* ECF 34-4 at 2. On July 10 or 11, 2014, Watson met with Kennedy and verbally denied her request to attend the BIG Conference. *See id.* at 4; ECF 37 ¶ 11; ECF 36 at 19 ¶¶ 108–10.

The parties disagree about why Watson denied Kennedy's request. The agency argues that Watson had a legitimate, nonretaliatory reason for the denial: Kennedy's justification did not make clear "how her attendance would benefit her or her career development plans, or how it was related to her duties or would benefit the organization." ECF 34-4 at 3. Furthermore, because Kennedy was new to Watson's staff at the time "and would require training to learn her new job duties," Watson was not sure whether she could afford to have Kennedy away at a conference for a week. *Id.*

The burden shifts to Kennedy to show that reason was pretext for retaliation. *See Brady*, 520 F.3d at 494. Although it is a close issue, the Court finds that Kennedy has just barely made that showing. First, Watson refused to allow Kennedy to attend the conference shortly after she made her discrimination complaints. Watson decided not to submit Kennedy's name for consideration about six weeks after Kennedy filed her informal EEO complaint, and verbally denied Kennedy's request roughly six weeks after she filed her formal EEO complaint. *See* ECF 37 ¶ 5 (dates of EEO complaints); ECF 34-4 at 2–3 (dates of denial); ECF 44 at 6 (not contesting that denial was temporally proximate to protected activity). As the Court has already noted, "[t]he temporal proximity between an employee's protected activity and her employer's adverse action is a common and often probative form of evidence of retaliation," *Walker*, 798 F.3d at 1092, although temporal proximity without more is insufficient to survive summary judgment, *see Minter*, 809 F.3d at 71–72.

Second, there is a genuine dispute of material fact as to what Watson said during the July meeting and whether Watson was aware of Kennedy's EEO activity when she denied her request to attend the BIG conference. Kennedy states in her affidavit that, when the topic of the BIG conference came up during their July 11 meeting, "Ms. Watson said, 'Why did you not do that

Matt asked you to do?' referring to not filing an EEO complaint." ECF 36-72 at 3. Watson denies making any statement about Kennedy's EEO activity during the July 11 meeting, and claims that she first became aware of Kennedy's EEO complaints on October 16, 2014. *See* ECF 34-4 at 4. A reasonable jury that credits Kennedy's testimony could find that Watson raised Kennedy's EEO complaint in the context of a discussion about why Kennedy could not attend the BIG Conference—and that could suggest retaliatory intent. (At the very least, it would suggest that Watson was aware of Kennedy's EEO complaint.) There is accordingly a genuine dispute of material fact as to whether Watson referenced Kennedy's EEO complaint in the context of their conversation about the conference.

Taking together (1) the temporal proximity between Kennedy's EEO activity and Watson's denial, and (2) Watson's alleged reference to Kennedy's EEO activity in the context of a discussion about why Kennedy could not attend the BIG Conference, Kennedy has produced just enough evidence to allow a reasonable jury to find that Watson's asserted reason for the denial was mere pretext for retaliation.[8] *See Brady*, 520 F.3d at 494.

The agency argues that it is nonetheless entitled to summary judgment because Kennedy failed to present evidence that Watson's denial was an adverse employment action, "especially

---

[8] The remaining evidence Kennedy points to is "not significantly probative" of pretext. *Anderson*, 477 U.S. at 249–50. First, Kennedy speculates that Watson might have known about her EEO activity earlier than October 2014 because she is married to Rhoads' boss, Dr. Watson—and it was Dr. Watson who identified Kennedy's detail assignment. *See* ECF 37 ¶ 10; ECF 36-58 at 12; ECF 36-62 at 2. Kennedy claims that, after Dr. Watson found a detail position for Kennedy, he "reached out to [Ingrid] Watson, his wife, to inquire about placing Ms. Kennedy with her." ECF 37 ¶ 10. But the record citation Kennedy relies on does not support that proposition. Ingrid Watson testified only that her supervisor consulted with her about placing Kennedy in the Management Analyst position, ECF 36-62 at 3, and Watson's supervisor at the time was Alan Dowdy, not her husband, *see* ECF 34-4 at 2. The evidence reflects only that (1) the Watsons are married, and (2) Dr. Watson had some involvement in selecting Kennedy's detail assignment. Anything further—including the idea that Dr. Watson shared information with his wife about Kennedy's EEO complaint—is pure speculation. Second, Kennedy notes that she sent Ingrid Watson an email on July 21 stating: "thanks for meeting with me again regarding the Blacks in Government Training Conference, however I did not appreciate you bringing up my prior work ethic under Mr. Matthew Rhoads. Just so that you know, my prior work ethics with Mr. Rhoads were excellent." ECF 36-44 at 1. Because Kennedy does not explain how discussing her work ethic under Rhoads equates to discussing her EEO complaint, it is not clear how this email supports her argument for pretext.

because Ms. Watson offered her other training from other sources." ECF 44 at 5. The agency cites

to no caselaw, confining its argument to a handful of conclusory statements. *See* ECF 34 at 14;

ECF 44 at 5. To establish a Title VII retaliation claim, Kennedy "must show that a reasonable

employee would have found the challenged action materially adverse." *Burlington N. & Santa Fe

Ry. Co. v. White*, 548 U.S. 53, 68 (2006). A challenged action is "materially adverse" if it "might

have dissuaded a reasonable worker from making or supporting a charge of discrimination."[9] *Id.*

(quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). The record reflects that the

BIG Conference would provide Kennedy opportunities to earn college credits, ECF 36-40 at 2, as

well as "enhance [her] current skills and foster professional development to further [her] career in

the Federal Sector and to network with other Federal Agencies," ECF 36-43 at 3. Viewing this

evidence in the light most favorable to Kennedy, the Court concludes that a reasonable employee

could be dissuaded from filing an EEO complaint if they knew that they would be denied the

opportunity to attend a conference where they could earn college credits and otherwise advance

their career. *See, e.g.*, *Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 836 (E.D. Va. 2016) ("[I]t

cannot be said, as a matter of law, that a reasonable person would not be deterred from engaging

in protected activity with the prospect of losing class-taking privileges on the line. Such an

imposition goes beyond the incivility, ordinary tribulations, petty slights, minor annoyances,

personality conflicts, snubbing, or lack of manners which the *White* Court intended to exclude

from the realm of 'material adversity.'" (quoting *White*, 548 U.S. at 68)).

---

[9] In *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), the Supreme Court clarified that a plaintiff need not allege "significant" or "serious" harm to establish a Title VII discrimination claim. *Id.* at 350. But neither *Muldrow* nor the D.C. Circuit's preceding *en banc* decision in *Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022) overruled the "material adversity" requirement for Title VII retaliation claims. *See Muldrow*, 601 U.S. at 357 (explaining that the Supreme Court adopted the "material adversity" standard "for reasons peculiar to the retaliation context"); *Chambers*, 35 F.4th at 877 (holding that a "material adversity" requirement "is entirely consistent" with the objective of Title VII's anti-retaliation provision).

The agency contends, and Kennedy does not contest, that when Watson denied Kennedy the opportunity to attend the BIG Conference, she also offered Kennedy alternative training opportunities. ECF 34 at 13; *see* ECF 37 ¶ 11. Those trainings included three leadership programs and two job fairs. *See* ECF 34-5 at 9. However, the Court lacks sufficient information about those alternative training opportunities to assess whether they were comparable to the BIG Conference. The agency does not cite any evidence establishing that Kennedy would have received the same benefits and opportunities for career advancement—like college credit—from the alternatives it provided her. Hypothetically, if Training A would be far more valuable to an employee than Training B, an employee might be dissuaded from engaging in protected activity knowing she would be denied the opportunity to attend Training A as a result—even if she nonetheless had the opportunity to attend Training B. Absent information about the potential value or benefit of these alternate training opportunities Watson proposed, and particularly in light of the conclusory treatment the agency gives this issue, the Court cannot find—as a matter of law—that this offer of alternate trainings neutralizes the "material adversity" of missing out on the opportunity to attend the BIG Conference.

Because Kennedy has nudged her retaliation claim into the realm of reasonableness, the Court must allow this claim to go forward.[10]

### 2. *Federal Interagency Diversity Partnership Training Day*

Kennedy also argues that Watson denied her the opportunity to attend the 2014 Federal Interagency Diversity Partnership (FIDP) Training Day in retaliation for her protected activity. *See*

---

[10] At this time, the question is not whether Kennedy could prevail at trial on this claim, or the amount of her damages. At summary judgment, the only question before the Court is whether there is no genuine dispute of material fact such that the agency is entitled to judgment as a matter of law. And given the agency's conclusory treatment of the material adversity question and the record evidence Kennedy cites to support her claim, the Court cannot come to that conclusion here.

ECF 36 at 32. When Kennedy emailed Watson to ask whether she could attend the event, Watson replied: "The November 12 event sounds interesting, but I would like you to be in Riverdale instead on that day. We'll have an internal PIM meeting, which will be Alan [Dowdy]'s first one in a while, and I want maximum participation that day." ECF 36-46 at 3. That is a legitimate, nonretaliatory reason for denying Kennedy's request to attend the training, and Kennedy points to no evidence whatsoever to suggest Watson's reason was pretextual. *See* ECF 36 at 32 (failing to address this rationale). The agency is entitled to summary judgment on this issue.

### C. Hostile Work Environment

Kennedy argues that the same adverse actions that underly her discrimination and retaliation claims—namely, her reassignment and the denial of training opportunities—also support a hostile work environment claim. *See* ECF 36 at 34–35. But, with the exception of Watson's decision to deny Kennedy's request to attend the BIG Conference, the Court has already determined that there is no evidence that the agency took these actions because of Kennedy's race or protected activity. Evidence that "bears no connection to [a plaintiff's] race . . . cannot support a hostile work environment claim." *Harris v. Wackenhut Servs., Inc.*, 419 F. App'x 1, 2 (D.C. Cir. 2011) (per curiam).

Kennedy also alleges that she was subjected to a hostile work environment because Wiley "wrote nasty e-mails and yelled at her in meeting[s]," and Kennedy's supervisors "fail[ed] to investigate or take any action after Plaintiff complained about Ms. Wiley's actions." ECF 36 at 34. An employer may be held liable under Title VII for harassment by a subordinate—but only harassment that would itself violate Title VII. *See Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013) ("[A]n employer is directly liable for an employee's *unlawful* harassment if the employer was negligent with respect to the offensive behavior." (emphasis added)). And nowhere does

24

Kennedy allege that Wiley's harassment was motivated by Kennedy's race or other protected characteristic.

That leaves only three possible incidents that could support Kennedy's hostile work environment claim. First, as discussed above, Watson denied Kennedy the opportunity to attend the BIG Conference. *See supra* Part III.B.1. Second, Kennedy claims that her supervisors "made harassing and demeaning comments to her to intimidate her against filing an EEO complaint." ECF 36 at 34. Kennedy provides no citation to support this claim. The Court takes this to be a reference to the April 21, 2014 meeting during which Kennedy alleges that Rhoads "was upset that she had filed her EEO complaint" and told Kennedy "in a loud tone, 'You know, you can use any remedy you like, it doesn't matter to me.'" ECF 36 at 18. Kennedy says that she "was intimidated by his comment and took it to understand that her situation would never improve or be resolved because she had filed an EEO complaint." *Id.* at 19. Third, Kennedy states that her supervisor "inferred that Plaintiff should start looking for another job." ECF 36 at 34. This seems to be a reference to an email Watson sent Kennedy in July 2014, "in which she asked Plaintiff to give her information regarding local job fairs that Plaintiff wanted to attend." ECF 36 at 19. Kennedy says she had never requested to attend any job fairs and "believed that Ms. Watson's e-mail implied that [she] should start looking for another job." *Id.* at 19–20.

"The bar for demonstrating a hostile work environment claim is a high one." *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 183 (D.D.C. 2016). To cite just a few examples, the D.C. Circuit has declined to find a hostile work environment existed where a supervisor insulted and demeaned an employee in front of co-workers, threw a notebook at her, issued her negative performance reviews, and selectively enforced a time and attendance policy to her detriment. *See Brooks*, 748 F.3d at 1275–76. The Circuit again found no hostile work environment

where the plaintiff's supervisor issued him poor performance reviews and a letter of reprimand, restricted his ability to take sick leave, proposed that the plaintiff be suspended, and "allegedly threatened to have [plaintiff] arrested, led out of the building in handcuffs, and jailed." *Baloch v. Kempthorne*, 550 F.3d 1191, 1195 (D.C. Cir. 2008). Even construing the evidence in the light most favorable to Kennedy, the Court cannot conclude that one lost training opportunity and two vague comments by supervisors amount to "discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of [Kennedy's] employment and create an abusive working environment." *Brooks*, 748 F.3d at 1276 (quoting *Ayissi-Etoh*, 712 F.3d at 577). The agency is entitled to summary judgment on this claim.

*    *    *

For the foregoing reasons, Defendant's motion for summary judgment, ECF 34, is **DENIED** as to Plaintiff's claim that the agency retaliated against her by denying her request to attend the BIG Conference and is otherwise **GRANTED**.

   **SO ORDERED.**

                _____
                JIA M. COBB
                United States District Judge

Date: June 12, 2025